IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| KRISTEN H. POTTS<br>27643 North 113 Place<br>Scottsdale, Arizona  85262<br><br>    Plaintiff<br><br>v.<br><br>MARYLAND GAMES, LLC<br>8403 Colesville Road, Suite 1100<br>Silver Spring, Maryland  20910<br><br>Serve on:<br>   Incorp Services, Inc.<br>   1519 York Road<br>   Lutherville, Maryland  21093<br><br>    Defendant | *<br>*<br>*<br>*<br>*    Civil No: 18-_____<br>*<br>*<br>*<br>*<br>*<br>*<br>* |

\* \* \* \* \* \* \* \* \* \* \* \*

COMPLAINT

Plaintiff Kristen H. Potts ("Potts"), as and for her Complaint against Defendant Maryland Games, LLC ("Maryland Games"), hereby states and allege as follows:

Jurisdiction and Venue

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as this action is between citizens of different states and the damages exceed the jurisdictional requirements therein.  This Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

2. Venue is appropriate in this Court as the Court has jurisdiction over the Defendant as it maintains its principal place of business within this judicial district and a substantial number of the acts which give rise to Plaintiff's claims occurred in Maryland.  Venue is proper in this Court under 28 U.S.C. § 1391(b).

Parties

3. Potts is an individual and resident of the State of Arizona who resides at 27643 North 113 Place, Scottsdale, AZ 85262.

4. Maryland Games is a Maryland limited liability company which was organized in the State of Maryland and has its principal place of business at 8403 Colesville Road, Suite 1100, Silver Spring, MD 20910.

Factual Background

5. Potts and Technology Exclusive, Inc. ("TE"), a Nevada corporation, entered into an agreement on or about October 16, 2015, in which TE agreed to pay Potts the principal sum of $1,500,000, payable on or before October 16, 2018, together with interest only payments on the principal at the rate of 7% per annum on the first of each month.

6. TE executed a Promissory Note ("Note") in favor of Potts in the amount of $1,500,000 on or about October 16, 2015, a true and correct copy of which is attached hereto as **Exhibit A**.

7. TE also executed a Security Agreement ("Security Agreement") in favor of Potts on or about October 15, 2015, a true and correct copy of which is attached hereto as **Exhibit B**.

8. To secure the due and timely payment and performance of TE's liabilities and obligations to Potts, including those under the Note and the Security Agreement, TE granted to Potts a first priority security interest in TE's assets (hereinafter "the Collateral"), described Section 1 of the Security Agreement as follows:

> All of the personal property of the Debtor, wherever located, and now owned or hereafter acquired, including:  Accounts, Chattel paper; Fixtures; Inventory; Equipment; Instruments, including Promissory Notes; Investment Property; Documents; Deposit accounts; Letter-of-Credit rights; General intangibles, including payment intangibles; Supporting Obligations; all books and records, financial records, financial statements, balance sheets,

>income statements, profit and loss statements, receipt and disbursement journals, general ledgers, customer lists, credit files, computer files, programs, printouts and other computer materials and records relating to the foregoing and any General Intangibles at any time evidencing or relating to any of the foregoing; and, to the extent not listed above as original collateral, all other assets, personal property and rights of the Debtor, whether tangible or intangible, including but not limited to computer storage media, computer programs, computer software and hardware, data processing records, proprietary games, casino games, gaming machines, electronic pull tab machines, patents, trademarks, service marks, trade secrets, copyrights and exclusive licenses (whether issued or pending), inventions, plans, drawings, goodwill, monies, accounts receivable, rents, rental fees, fees, payments, revenues, income, book debts, payments under leases or sales of equipment or inventory and other forms of obligations now or hereafter received by or belonging to Debtor for goods sold or leases and/or services rendered by it; updates, modifications or improvements to any computer programs, computer software and hardware, proprietary games, casino games, gaming machines, and electronic pull tab machines; all contracts and contract rights, leases and lease rights, instruments, undertakings or other agreements in or under which Debtor may now or hereafter have any right, title or interest; tax refunds due Debtor from any governmental agency; all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

9.  Under the Security Agreement, TE agreed that it would use the Collateral only in the ordinary course of its business, for its intended purpose and in compliance with all applicable laws, statutes and local ordinances.

10. The Security Agreement further provides that TE shall be in default upon the occurrence of a default under the terms of the Note or a material breach of the terms of the Security Agreement.

11. On or about October 27, 2015, Potts filed a UCC Financing Statement ("Financing Statement") with the Nevada Secretary of State, a true and correct copy of which is

attached hereto as **Exhibit C**. The filing of the Financing Statement perfected Potts's rights in the Collateral and provided notice to the world, including Maryland Games, of these rights.

12. TE defaulted under the terms of the Note by failing to pay monthly interest in the amount of $8,750.00 due on October 1, 2018.

13. On October 5, 2018, Potts provided written notice of said default under the Note to TE by certified mail (postage prepaid, return receipt requested), and by U.S. mail and email to TE's attorney Andrew P. Kelly, at the addresses provided for in the Note.

14. TE failed to cure said default within thirteen days following the date the notice of default was deposited into the U.S. Mail.

15. TE has also failed to pay to Potts the principal sum due under the Note in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) on or before October 16, 2018.

16. TE is also in default under the Note for having failed to pay to Potts the principal sum due under the Note on or before October 16, 2018.

17. By virtue of its defaults under the Note, TE is also in default under the terms of the Security Agreement.

18. In addition, TE has sold certain of its assets that are Collateral under the Security Agreement to Maryland Games.

19. The assets that TE sold to Maryland Games were pursuant to an asset purchase agreement dated on or about September 14, 2017, under which TE sold certain of its games, licenses, permits, books, records, location contracts, and warranties, all of which were Collateral under the Security Agreement, to Maryland Games for cash consideration.

20. Under the asset purchase agreement between TE and Maryland Games, TE granted to Maryland Games an exclusive, perpetual, royalty-free license to use, sell, resell,

sublicense and distribute software and intellectual property located in Maryland, including bingo machines located at Rod 'N' Reel and Trader's Seafood, Steak and Ale.

21. The assets sold to Maryland Games were Collateral under the Security Agreement to which Potts had superior rights that prohibited their transfer without her consent.

22. The sale of assets to Maryland Games was not in the ordinary course of TE's business.

23. TE's sale of assets to Maryland Games violated the Security Agreement.

24. By virtue of Potts's duly filed UCC Financing Statement, Maryland Games had actual or constructive knowledge of Potts's first position security interest in the Collateral that it purchased as described above.

25. On or about September 14, 2017, Maryland Games entered into a purported consulting agreement to retain TE representative Philip Lulek ("Lulek") as an independent contractor consultant for a period of two years with an annual salary.

26. Upon information and belief, the purported consulting agreement is actually a disguised portion of the purchase price for the purchase of TE's assets.

27. Upon information and belief, Maryland Games has remitted payment to TE for the purchase of certain the Collateral referenced herein and/or to Lulek pursuant to the purported consulting agreement.

28. Upon information and belief, Maryland Games has received, and continues to receive, monies derived from the use of the Collateral at locations in Maryland, which upon information and belief include but are not limited to locations operated by Chesapeake Amusements, Inc. and Eagle Amusements, Inc.

29. Neither TE nor Maryland Games remitted any payment to Potts despite the fact that Potts had a first position security interest in the Collateral that TE sold to Maryland Games and the fact that Potts had filed a Financing Statement covering the Collateral.

30. In or about 2017, the Maryland Lottery and Gaming Control Commission ("Commission") issued a video lottery facility manufacturer license to Maryland Games ("License").

31. Upon information and belief, prior thereto, the Commission knew of the Note and Potts's security interest but nonetheless granted a License to Maryland Games and allowed Maryland Games to acquire TE's assets and receive revenues from those assets notwithstanding, and in violation of, Potts's security interest.

32. Maryland Games is liable to Potts in an amount in excess of $75,000.00 to be proved at trial.

## COUNT I
### Conversion

33. Potts re-alleges the foregoing paragraphs as though fully set forth herein.

34. Potts has a security interest in the Collateral.

35. Potts perfected her security interest in the Collateral.

36. TE defaulted under the Security Agreement by, among other things, failing to pay amounts due to Potts under the Note.

37. TE defaulted under the Security Agreement by, among other things, transferring the Collateral to Maryland Games without Potts's permission.

38. Potts has a right to possession of the Collateral.

39. Maryland Games had actual or constructive knowledge of Potts's rights to the Collateral but purchased and took possession of it in disregard of those rights.

40. Potts is entitled to judgment against Maryland Games for, among other things, damages in an amount to be proved at trial, together with pre-judgment interest from the earliest date allowed by law, attorneys' fees and costs incurred by Potts.

41. Potts is also entitled to judgment for recovery of the Collateral.

## COUNT II
## Replevin

42. Potts re-alleges the foregoing paragraphs as though fully set forth herein.

43. Potts has a security interest in the Collateral.

44. Potts perfected her security interest in the Collateral.

45. TE defaulted under the Security Agreement by, among other things, failing to pay amounts due to Potts under the Note.

46. TE defaulted under the Security Agreement by, among other things, transferring the Collateral to Maryland Games without Potts's permission.

47. Potts has a right to immediate possession of the Collateral.

48. Maryland Games has actual or constructive knowledge of Potts's rights to the Collateral.

49. Potts is entitled to judgment against Maryland Games for, among other things, recovery of the Collateral and/or damages in an amount to be proved at trial, together with pre-judgment interest from the earliest date allowed by law, attorneys' fees and costs incurred by Potts.

## COUNT III
## Unjust Enrichment

50. Potts re-alleges the foregoing paragraphs as though fully set forth herein.

51. Maryland Games has wrongfully and inequitably benefitted from the possession of Potts's Collateral and the receipt of income derived therefrom without having to pay Potts for the same.

52. Maryland Games will continue to benefit by retaining said Collateral and the income derived therefrom without paying Potts for the same.

53. Maryland Games has been unjustly enriched at the expense of Potts.

54.     Alternatively or in addition to other remedies, as a direct and proximate result of Maryland Games' unjust enrichment, Maryland Games is liable to Potts in an amount to be proved at trial, together with pre-judgment interest from the earliest date allowed by law, attorneys' fees and costs incurred by Potts.

### COUNT IV
### Accounting

55.     Potts re-alleges the foregoing paragraphs as though fully set forth herein.

56.     Potts is entitled to a full accounting from Maryland Games of all of the Collateral, including all income derived from the use of the Collateral, and Potts hereby demands that Maryland Games account for the same.

WHEREFORE, Potts demands judgment against Maryland Games as follows:

A.      Money judgment against Maryland Games, in an amount to be proved at trial, together with pre-judgment interest thereon from the earliest date allowed by law until paid in full;

B.      An order for recovery of the Collateral, including all revenues derived therefrom;

C.      A constructive trust over all funds generated or derived from use of the Collateral;

D.      An award of Potts's costs and reasonable attorneys' fees incurred herein to the extent allowed by law; and

E.      Such other and further relief as the Court deems just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff Kristen H. Potts hereby demands that the above-captioned case be tried before a jury.


Dated:   October 19, 2018                                    /s/ Lisa Yonka Stevens
Lisa Yonka Stevens, 27728
Yumkas, Vidmar, Sweeney & Mulrenin, LLC
10211 Wincopin Circle, Suite 500
Columbia, Maryland  21044
Phone: (443) 569-0795
Fax: (410) 571-2798
lstevens@yvslaw.com

Counsel for Plaintiff